Samantha PRICE, by her mother as next of kin, Ruth PRICE; Najda Stegall, by her mother as next of kin, Dorothy Stegall; Brandon and Ryan McMurthy, by their parents as next of kin; Reginald Robert Williams, Jr., by his mother as next of kin, Joanne Williams; George Bertram Powell, by his mother as next of kin, Elaine Powell; Minique Kindred, by her mother as next of kin, Avonne Kindred, Oscar Herrera, by his mother as next of kin, Lillian Herrera; Santos Salinas, by his father as next of kin, Daniel Salinas; Jessica Amezquita, through her mother and next friend, Sandra Amezquita, Elias Flores Harrington, through his parents and next friends, Rebecca Flores Harrington and James Harrington; Central Texas Chapter, ACLU, United South Austin, Plaintiffs,

v.

AUSTIN INDEPENDENT SCHOOL DISTRICT; Dr. John Ellis, Individually and in his official capacity as Superintendent of Austin Independent School District; Nan Clayton, Individually and in her capacity as School Board President of Austin Independent School District; Ed Small, Individually and in his official capacity as School Board Member of Austin Independent School District; Gary McKenzie, Individually and in his official capacity as School Board Member of Austin Independent School District; Bernice Hart, Individually and in her official capacity as School Board Member of Austin Independent School District; John Lay, Individually and in his official capacity as School Board Member of Austin Independent School District; Abel Ruiz in his official capacity as School Board Member of Austin Independent School District; Lidia M. Perez, in her official capacity as School Board Secretary of Austin Independent School District, Defendants.

No. A–87–CA–483.

United States District Court, W.D. Texas, Austin Division.

Jan. 12, 1990.

As Amended Jan. 19, 1990.

Norma V. Cantu, San Antonio, Tex., for MALDEF (Mexican American Legal Defense and Educ. Fund).

Julius L. Chambers and Napoleon B. Williams, Jr., New York City, and Lydia Gardner, Co-counsel for NAACP, Austin, Tex., for NAACP (Nat. Ass'n for the Advancement of Colored People).

David Van Os, Van Os, Deats, Rubinett & Owen, Austin, Tex., for ACLU (American Civil Liberties Union).

William H. Bingham, James R. Raup and John Spurgin, McGinnis, Lochridge & Kilgore, Austin, Tex., for AISD (Austin Independent School Dist., et al.).

## AMENDED MEMORANDUM OPINION

NOWLIN, District Judge.

### I. BACKGROUND

On August 7, 1987, Plaintiffs filed this action claiming that in adopting a new student assignment plan and "Educational Excellence Plan" affecting elementary school students (grades pre–K–5), the Austin Independent School District ("AISD") acted with discriminatory intent to create racially and ethnically segregated schools in violation of the Fourteenth Amendment to the U.S. Constitution, Title VI of the Civil Rights Act, and the Equal Educational Opportunities Act of 1974. All parties having the benefit of a period of approximately two (2) years to prepare for trial, this case was tried to the Court during the period from November 6, 1989 through November 9, 1989, at which time the Court heard the testimony of witnesses and argument of counsel for the several parties and received exhibits into the record.

AISD has been the subject of a desegregation suit since 1970. In a veritable litany of cases the Fifth Circuit has found that AISD discriminated against Black and Mexican–American students by intentionally operating a dual school system in violation of federal statutes and the United States Constitution.[1] Subsequent to repeated review by the Circuit, a Memorandum Opinion and Order was entered by this Court on November 5, 1979 calling for the submission of an integrative student assignment plan to the Court by January 15, 1980. The 1970 litigation eventually culminated in settlement, with all parties agreeing to a Consent Decree entered by the Court on January 2, 1980.

The 1980 Consent Decree represented the resolute commitment of all parties to transform AISD into a unitary school system. The decree provided for the implementation of busing, alteration of attendance-zone lines, as well as other integrative actions. Under the decree, the Court would retain jurisdiction over the case for three years. Upon the expiration of the three-year period, subsequent to notice and the opportunity to object, AISD would be declared a unitary school system and the case dismissed. In 1983, Plaintiff–Intervenors filed objections to AISD being declared unitary. Following negotiations, all parties filed an Agreed Motion to Dismiss on June 14, 1983. Subject to a Stipulation filed with the Court, the parties agreed that AISD would be declared unitary and the case dismissed with prejudice. By Order of this Court filed June 14, 1983 AISD was declared to be a unitary school district. Pursuant to the Stipulation, the Court retained jurisdiction to hear motions for further relief for an additional three years or until construction of Kealing Junior High School was completed whichever occurred later. With the junior high school construction complete in September 1986, this Court's jurisdiction in Cause No. A–70–CA–80 expired, as did its power to enforce the Stipulation and the Consent Decree. *United States v. Overton*, 834 F.2d 1171 (5th Cir.1987).

The present case was born of an attempt by Plaintiffs to reopen *United States v. Texas Education Agency*, A–70–CA–80 (*Overton*), by filing a motion for further relief and preliminary injunction in that cause on July 2, 1987.[2] Movants (Plaintiffs herein) sought to enjoin the implementation

---

1. *United States v. Texas Education Agency*, 467 F.2d 848 (5th Cir.1972); *United States v. Texas Education Agency*, 532 F.2d 380 (5th Cir.1976), *vacated*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *United States v. Texas Education Agency*, 564 F.2d 162 (5th Cir. 1977), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *United States v. Texas Education Agency*, 579 F.2d 910 (5th Cir.1978);

*cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979).

2. The parties in *United States v. Texas Education Agency*, No. A–70–CA–80 (Overton) and in this case are virtually the same. The Consent Decree declaring AISD a unitary district was accepted by these parties in 1983, all represented by the same legal counsel appearing in this action.

of an elementary school student assignment plan adopted by AISD on April 13, 1987. On July 24, 1987 this Court determined that the relief sought by Plaintiff–Intervenors could not be obtained in A–70–CA–80, ordered the motion dismissed; and, in consideration of the fact that the Fall 1987 school term would soon commence, declared that Plaintiff–Intervenors should *promptly* file a new complaint and seek injunctive relief in connection with that complaint. 671 F.Supp. 484. Rather than immediately filing a new complaint, Plaintiff–Intervenors appealed this Court's order. The Fifth Circuit refused to issue a preliminary injunction and to consider the appeal on an expedited schedule. As a result, this suit was filed three weeks before AISD students were scheduled to report to school for the 1987–88 school year.

In the Complaint filed August 7, 1987 Plaintiffs launched an across-the-board attack on the new student assignment plan alleging intentional discrimination against Black and Mexican–American elementary school students as evidenced by the increased number of racially identifiable elementary schools, ineffective transfer policies, disparity in the quality of minority school grounds and facilities as compared to those at predominantly white schools, the lack of educational reasons for adopting the neighborhood school boundaries as adopted April 13, 1987, and alleging AISD's commitment to the Priority Schools Program illusory. A hearing on the Motion for Preliminary Injunction filed in the present case was held August 13, 1987 before the Honorable Walter S. Smith, Jr. in Waco, Texas. The motion was denied by written order filed August 21, 1987. The Fifth Circuit reviewed the Court's Orders of July 24, 1987 under A–70–CA–80 and August 21, 1987 under A–87–CA–483 in *United States v. Overton,* 834 F.2d 1171 (5th Cir.1987). The Circuit affirmed the orders of this Court in all respects, holding the 1980 Consent Decree no longer enforceable, and the preliminary injunction properly denied.

## II.  ISSUE

The sole question presented to the Court for resolution in this case can be succinctly stated: Did the Board of Trustees of the Austin Independent School District in adopting and implementing an elementary school student assignment plan on April 13, 1987 intend to discriminate against elementary school students because of their race or ethnicity? In resolving this question the Court has reviewed all of the evidence presented to it, both direct and circumstantial, and recognized both the segregative history of the District prior to 1980 and its unitary status by virtue of the Consent Decree of 1983.

## III.  FINDINGS OF FACT

Defendant AISD at present operates sixty-four (64) public elementary grade level schools in Austin, Texas, with a total elementary school population of 35,545 students. Of this total, 18.9% are Black, 35.9% are Hispanic, and 45.1% are Anglo. Among the sixty-four (64) elementary schools, twenty (20) schools have an enrollment of which 80% or more of the total number of students are racial or ethnic minorities. Prior to the implementation of the April 13, 1987 student assignment plan by the District, six (6) elementary schools of a total of sixty-five (65) such schools then existing had an enrollment of students of which 80% or more of the total number of students were racial or ethnic minorities. Although implementation of a neighborhood school concept as part of the new student assignment plan significantly contributed to this increase in the number of predominantly minority elementary schools, increases and shifts in District population since Court ordered desegregation through student transportation (1980) have also played a major part in the racial and ethnic make-up of these schools.

The AISD Board of Trustees is composed of seven (7) members elected at large from within the school district. AISD encompasses the City of Austin metropolitan area as well as surrounding residential areas in Travis County, Texas, and is a public school district organized and operating under the laws of the State of Texas.

On April 13, 1987, the AISD Board of Trustees adopted a student assignment plan which eliminated most busing of elementary school students and established neighborhood schools. AISD began public discussion of the necessity for student assignment boundary changes in December, 1985. Primary concerns of those calling for changes in student assignment included:

(1) Population growth and shifts within AISD;

(2) Opening of twelve (12) new schools within a three (3) year period;

(3) Severe space shortages in existing elementary schools due to student population growth;

(4) Enactment by the Texas Legislature in 1984 of H.B. 72, mandating a 22:1 pupil-teacher ratio as well as public pre-kindergarten programs;

(5) A need to reconfigure AISD to a middle school system, incorporating Grade 6 in the middle or junior high school level;

(6) More efficient utilization of existing facilities;

(7) Loss of families and students to private schools and to outlying school districts;

(8) Parental involvement and student participation in school activities and programs;

(9) Pressing student transportation concerns related to traffic safety hazards, traffic congestion, and the duration of school bus rides for young children in the elementary grades.

On June 23, 1986 the Board of Trustees established by split vote nine criteria to be considered by the AISD staff in developing student assignment and boundary proposals.[3] As adopted the formal criteria for boundary changes were:

1. The target for ethnicity in each school will be a range within 10 percentage points of the white population districtwide [sic];

2. If students must be bused in order to attain the target at each school, they should be bused two to four years;

3. The desirable average time a student should spend on a bus one way would be up to 45 minutes for both elementary and secondary students;

4. The earliest time for a student to be picked up would be 7:15 a.m. for elementary students and after 7:15 a.m. for secondary students;

5. The latest desirable time for a student to be delivered home without considering extracurricular activities would be 3:45 p.m. for elementary students and 4:45 p.m. for secondary students;

6. If students must be bused in order to attain the target at each school, grades 6 through 12 should be bused;

7. The maximum desirable distance for a student to be bused one way is 10 road miles, one way;

8. If the target can not be met at each school, then all schools with high concentrations of low achieving/low-income students would have additional resources to provide an enriched learning environment;

9. The organizational structure for schools should be the middle school structure (Elementary: pre-K–5; Middle school: 6–8; High school: 9–12).

AISD Board Minutes June 23, 1986.

The Board of Trustees eventually elected to forego the appointment of an outside consultant, choosing instead to conduct an in-house formulation of a new student assignment plan.[4] Using the nine criteria as

---

**3.** The Board of Trustees was comprised at this time of Nan Clayton, John Lay, Gary McKenzie, Ed Small (Anglos), Bernice Hart (Black), Lidia Perez and Abel Ruiz (Hispanic). The nine criteria were adopted by the Board on the motion of Mr. Abel Ruiz, seconded by Ms. Bernice Hart. The vote was 4–3 in favor of adopting the criteria. Trustees Lay, McKenzie, and Small voted

against adoption. Trustees Clayton, Hart, Perez, and Ruiz voted for adoption.

**4.** As evidenced by the minutes, between July 14, 1986 and November 24, 1986 the Board never formally voted against hiring an independent consultant. Apparently, the consultant was eliminated during the budgeting process for

a framework and a sophisticated computer program, Mr. Dan Robertson and Mr. Dan Roberts [5] of the AISD staff developed numerous alternative student assignment plans which were submitted to AISD Superintendent Dr. John Ellis, the administrative staff, members of the Board of Trustees, district residents, and interested parties (including representatives of the NAACP and MALDEF) at various times between February 23, 1987 and April 13, 1987. Various changes in the plan's proposed attendance zones were made as a result of public discussion and input from AISD administrators and staff as well as from members of the Board of Trustees. On April 13, 1987 the AISD Board voted 5–2 [6] to adopt the student assignment plan that would become the center of the present controversy.

While the new student assignment plan ostensibly addressed the nine criteria and the concerns discussed *supra*, the April 13, 1987 vote was also a conscious decision by the Board to establish neighborhood elementary schools in AISD. The plan as adopted significantly changed the organization of grades pre-K through 6 in several ways. The 1987 plan set new boundaries for 48 elementary schools while 15 elementary-school boundaries remained unchanged. The new boundaries were drafted so that students could attend school within 10 road miles from their homes, resulting in neighborhood schools. Creation of neighborhood schools also served to shorten bus rides and reduce the number of bus routes of over 45 minute duration. Grades 6–8 were restructured into a middle school system although two junior high schools were left intact.[7] Restructuring was intended to bring AISD in line with the majority of school systems in the country as well as make efficient use of existing facilities.[8] Students assigned outside their neighborhoods under the new plan who had been bused for more than two years to another school, as well as any student assigned for integration purposes under the 1979 plan, could elect to remain in their old schools. Four "magnet programs" were continued for integration purposes.

The new plan retained AISD's majority-minority transfer policy. This transfer policy allows any student whose race or ethnicity constitutes the majority of the school's population to transfer with free transportation to a school where the student's racial or ethnic group is a minority of the school's population. The stated purpose of the program is to complement student assignments and promote integration throughout AISD. Transfers are limited by the availability of space at a particular school, and are awarded on a first-come first-served basis. The policy specifically provides that "[n]o transfer will be approved that will adversely affect the ethnic proportions of a school or otherwise conflict with the District's commitment to integration". Official Board Minutes, April 13, 1987 Attachment E. Once the transfer has been approved the student is treated as a resident in the school's attendance area and the transfer cannot be revoked for disciplinary or academic reasons.

Of major importance to the adopted student assignment plan is the "Plan for Educational Excellence," (referred to as the

___

lack of available funds. On November 24, 1986 the Board *did* vote to direct the administration to develop at least two plans that would equitably achieve as many of the criteria as possible. Trustees Ruiz and Perez voted against this proposal.

5. Both Mr. Robertson and Mr. Roberts have long been affiliated with AISD and its administrative staff. Dan Robertson has been involved in desegregation planning for the AISD for fifteen years and played a considerable role in the implementation of the 1980 Consent Decree. Robertson is currently Assistant Director of Management Information for the school district. This department consolidates all relevant data involving the district and is charged with long-range planning. Dan Roberts has been the director of AISD's Transportation Department since 1987.

6. Trustees Perez and Ruiz voted against adoption of the plan.

7. Kealing and Martin Junior High.

8. Most school districts in the U.S. employ a Middle School structure in which grades 6–8 attend a single school. Under the old Junior High structure, only grades 7 and 8 were combined.

"Priority Schools Program"), which provides additional resources and personnel to sixteen (16) elementary schools that had predominantly minority enrollment after the 1987 boundary changes. It is these schools that are the focus of Plaintiff's complaint.[9] The Priority Schools Program is an attempt to compensate with superior faculty, staff, equipment, materials, and academic curriculum for any shortcomings incurred by a school as a result of its predominantly minority student population. Designed to be implemented and evaluated over a five-year period, the Program is built on ten points which include: exceptional administration and teachers, instruction based upon the effective school approach,[10] full day pre-kindergarten for four-year olds, a reduced pupil-teacher ratio, greater number of support staff to assist teachers, training the staff to use innovative and research-based teaching techniques, multi-cultural education to safeguard against the isolation of minority students, emphasis on fostering strong parental and community involvement in each Priority School, well-maintained buildings and grounds, and an accountability component designed to keep the public and AISD staff informed as well as to monitor and evaluate the Program periodically. The Priority Schools Program has been fully funded by the AISD Board each school year since its implementation.

Plaintiffs contend that the current student assignment plan is the result of conscious discriminatory intent of antibusing members of the 1987 AISD Board who use the phrase "neighborhood schools" as a transparent veil for the phrase "segregated schools." Plaintiffs presented the testimony of two (2) expert witnesses and of former Trustee Abel Ruiz in an attempt to establish discriminatory intent. In turn, Defendants presented their own in-house experts including AISD Board members, the school district Superintendent, members of the AISD staff, and school personnel in an attempt to dispel claims of discriminatory intent and to defend the educational objectives underlying the adoption of the new assignment plan. The Court finds the following testimony relevant to its determination of the facts in this case.

Witnesses for Plaintiffs included Laurie Jones, a retired AISD teacher and elementary school principal; James Harrington, representing Plaintiff ACLU; Rebecca Flores Harrington, the mother of an AISD elementary school student, and wife of James Harrington; Messrs. Volma Overton, Sr. and Volma Overton, Jr.; parents of AISD elementary school students; and Gary Bledsoe, current President of the Austin Chapter of the NAACP. Testifying as expert witnesses for Plaintiffs were Professor Yale Rabin and Professor Michael Stolee.

Plaintiffs offered the testimony of Professor Yale Rabin, an urban planner, Professor Emeritus of Urban Planning at the University of Virginia and currently a visiting Professor of Urban Studies and Planning at Massachusetts Institute of Technology, to show changes in the housing patterns of Black residents in AISD since the 1979 desegregation order entered by this Court. Professor Rabin described his specialty as "Analyst of Land Use Policies on Low Income and Minorities." He has testified as an expert witness in behalf of Plain-

---

**9.** The following schools are included in the Priority Schools Program: Allan, Allison, Becker, Blackshear, Brooke, Campbell, Govalle, Metz, Norman, Oak Springs, Ortega, Pecan Springs, Sanchez, Sims, Winn and Zavala. During the 1989–90 school year these elementary schools have the following ethnic composition: (1) Allan–96% minority; (2) Allison–97% minority; (3) Becker–90% minority; (4) Blackshear–99% minority; (5) Brooke–95% minority; (6) Campbell–100% minority; (7) Govalle–98% minority; (8) Metz–98% minority; (9) Norman–90% minority; (10) Oak Springs–98% minority; (11) Ortega–95% minority; (12) Pecan Springs–92% minority; (13) Sanchez–96% minority; (14) Sims–98% minority; (15) Winn–95% minority; (16) Zavala–97% minority. Four (4) elementary schools have student populations with 80% or greater minority enrollment and are apparently not included within the Priority Schools Program: (1) Andrews; (2) Blanton; (3) Harris; and (4) Ridgetop.

**10.** The effective schools approach places emphasis on educational excellence through quality personnel and research-based teaching techniques, tailoring an academic program to meet each school's particular needs.

tiff NAACP between 10–25 times prior to his appearance as a witness for that party in this case. Professor Rabin testified in the original *Overton* case in 1979. His testimony in the present case was based on two census maps, one compiled in 1970 and one in 1980. The Court finds that the maps indicate a clear majority of the Black population in AISD continues to live east of Interstate 35.[11] Professor Rabin declared that the racial isolation of Blacks in east Austin reflects the city's discriminatory past. This Court made such a finding in holding AISD to be operating a dual school system in 1979.

Professor Rabin compared the 1970 and 1980 census maps covering AISD and concluded that the Black population of Austin had increased from 29,816 persons in 1970 to 42,112 persons in 1980, an almost 30% increase over the decade. As a percentage of Austin's total population, however, Black population increased by only .4% during the ten-year period from 1970 to 1980. Looking at the 1970 map, this expert found Black persons were at that time heavily concentrated in East Austin census tracts 4, 8, 9 and 2102, as well as in the St. John's area in the southwest corner of census tract 1802. Observing the 1980 map, Professor Rabin concluded that over the 1970–80 decade Black persons in Austin had begun to disperse to almost every region of the census area; that an increase has occurred in the number of census blocks containing Black populations of 10–25%; that from 1/5th to 1/3rd of these "dispersed" persons were new residents of Austin; that concentrations of Black persons in East Austin had grown; and that the two areas of such concentration were expanding toward one another (East Austin and St. Johns). According to this witness' testimony, in 1970, 88.7% of Black persons in Austin resided east of IH–35 and in 1980, 80.7% of such persons resided east of that heavily traveled interstate artery. He voiced the opinion that the reason for concentrations of Black persons in certain geographical areas of Austin is the "persistence of [the] legacy of city and school segregative actions."

Professor Rabin's testimony is based upon official census data of the general Austin population and not of the Austin student population. Additionally, the data forming the basis of his opinions although nearly a decade old points to encouraging but slow ongoing dispersion of Black persons outside areas of previous concentration into areas formerly dominated by majority persons. Of greater significance to this case, however, is the fact that while Professor Rabin's testimony is of historical demographic interest, it does not impugn the motives or intent of AISD Trustees in adopting the assignment plan in April, 1987.

Plaintiffs also presented the expert testimony of Dr. Michael J. Stolee, since 1975 a Professor of Administrative Leadership at the University of Wisconsin, Milwaukee. Dr. Stolee served as a school desegregation consultant with various federal agencies during the Johnson, Nixon, and Carter Administrations. He teaches courses in the Legal Aspects of School Administration with emphasis on desegregation. Dr. Stolee has testified in other cases in behalf of Plaintiff NAACP on 7–8 occasions and has also testified as an expert witness for the NAACP Legal Defense Fund, the ACLU, the U.S. Department of Justice, and school boards, as well as serving the courts by special appointment. He testified that a cursory review of the student assignment plan indicated that boundaries could have been drawn so as to create fewer racially identifiable schools and drew several examples.[12] Dr. Stolee further testified that he could see no compelling educational reason to justify the number of minority teachers and administrators employed in the priority schools and concluded that, in his opinion, the existence of less discriminatory alternatives in the absence of compelling educational objectives indicates that the stu-

---

11. The traditional division between east and west Austin has been along IH–35, which runs through the city north to south passing just east of the downtown area.

12. Plaintiff's Exhibit 85.

dent assignment plan was implemented with intent to discriminate.

On voir dire examination, Dr. Stolee confided that he had never published a student assignment plan, nor published any statistical or demographic studies relating to school desegregation, nor published articles on "white flight," majority/minority transfer policies, or any matter relating to post-unitary student assignment plans. Dr. Stolee's testimony was based on his opinion formed after reviewing Plaintiff's Exhibits 22–81,[13] and after driving about Austin one weekend finding his way using a city road map he purchased at the Marriott Hotel newsstand shortly after arrival for his first visit to the Capitol city.[14] He identified sixty-three (63) exhibits ostensibly prepared from his weekend research, most dealing with school transportation routes and bus passenger information ("Transportation Comparison Tables"). Dr. Stolee did not make personal contact with any members of the AISD staff, teachers, students, PTA, or enter any school buildings.

From his tour of Austin and subsequent research, Dr. Stolee concluded that for the 1988–89 school year in excess of 75% of the school population in east Austin and the Becker and Allison school areas was Black and Hispanic and that for that same period in excess of 75% of the school population in the "western part of the city" was "other" (ostensibly meaning Anglo, Oriental or students not classified as Black or Hispanic).

Dr. Stolee further testified that in his view, Dr. John Ellis, Superintendent of AISD, is "an excellent administrator" and that of those responsibilities he (Dr. Stolee) considered primary responsibilities of a public school board including (1) obligations to follow federally mandated provisions of PL 94–142; (2) obligations to adhere to state mandated requirements, especially teacher-student ratios prescribed by

H.B.72; (3) commitment to special programs; (4) safety and convenience of students; (5) recognition of cultural diversities in the district; (6) attention to grade levels; and (7) consideration of the financial implications of assignment plans, the only area the AISD Board appeared deficient was in recognition of cultural diversities of students. Additionally, this witness expressed his opinion that if student transportation were necessary for integration purposes elementary school students should be transported (bused) as a priority over secondary school students.

Considering the somewhat cursory examination of AISD by Dr. Stolee, his failure to consider non-integrative bus routes and student passenger information in developing his statistical exhibits, and his lack of published expertise in many of the areas pertinent to the formation of a learned opinion on the questions surrounding the issue presented, the Court is unable to extend meaningful weight to opinion testimony based upon such haphazard research and often misleading statistical information.

In an attempt to establish that in adopting the April 13, 1987 student assignment plan, school board members acted with the intent to discriminate, Plaintiffs solicited the testimony of former board member Abel Ruiz. Mr. Ruiz was a member of the AISD Board of Trustees from April, 1982 until February, 1988 and served as its Vice–President for two years (1984–86). Though not an attorney, Mr. Ruiz is currently employed by the Texas Attorney General's Office in the Child Support Enforcement Division. He had previously been employed by the Texas Department of Community Affairs. Mr. Ruiz, as discussed *supra*, helped develop and sponsored adoption of the nine criteria adopted by the Board which were used as a frame-

**13.** Comparative tables of transportation by race and tables showing the ethnic distribution of students, administrators, and staff among AISD elementary schools. The transportation tables do not deal exclusively with regular student assignment routes, but also incorporate magnet school routes, bilingual education routes, special education routes and alternative school routes. The Court is not able to discern from

the testimony, exhibits, or evidence admitted at trial to what degree this compilation of statistics skews the percentages recited by Dr. Stolee during testimony.

**14.** Dr. Stolee arrived March 30, 1989 and departed April 3, 1989.

work for development of the April 1987 student assignment plan although he did not vote for adoption of the plan. On August 13, 1987, Mr. Ruiz testified before this Court (Walter Smith, J. presiding) as a witness for Plaintiffs seeking injunctive relief from the April, 1987 plan for the 1987–88 school year. At that time, Mr. Ruiz did not testify that adoption of the plan by the school board was with racial or ethnic discriminatory intent but rather he testified that adoption was the result of political and economic motives.[15]

> I think that's basically—the formula itself. I don't think it was based on purely white, as such, as color, but basically economic base, economic power in town, political power in town, and therefore, you know, it all adds up to being Anglo.

Transcript, lines 23–25, p. 39, line 1, p. 40, August 13, 1987.

Mr. Ruiz' testimony at trial continued to emphasize political and economic bases for the adoption of the April 1987 assignment plan but his November 1989 testimony included hitherto unspoken allegations of actions of the school board on which he served being "racially motivated." To witness Ruiz, those who promoted "neighborhood schools" and who opposed the continuation of widespread transportation of elementary school children were and are predominately motivated by racism and segregationist sympathies. That a substantial segment of AISD parents of elementary school age children supported the neighborhood school concept as well as the Priority Schools Program did not deter this witness from his view. That Ms. Bernice Hart, a popular fellow school district trustee and Black female, supported the neighborhood

school concept, opposed transportation of young elementary school children over extended route mileage and time and supported the April 1987 assignment plan was of no moment to former trustee Ruiz.

Mr. Ruiz testified that he believed the 1987 student assignment plan was the result of political pressure put on Anglo Board members by their constituents to stop busing of elementary children for integration purposes. Ruiz specifically alleged that Board members Small and McKenzie were "anti-busing" advocates, that Board member Nan Clayton discriminated against minority applicants for AISD administrative positions, that Board member McKenzie circulated anti-busing literature at Board meetings (although no such literature was offered at trial), and that Anglo members voted in blocks to thwart minority objectives. Ruiz stated that he believed opposition to busing and support for a neighborhood school system are both equal to discrimination. Ruiz later in his testimony agreed that Hispanic educators had once proposed and supported a neighborhood school system known as the "going back home" plan.

Mr. Ruiz stated that he felt criteria # 1 mandated an absolute ethnic ratio which should override criteria # 6 if necessary to achieve the stated ethnic balance.[16] Ruiz further testified that he would not have sponsored the nine criteria if he knew the Board did not intend to hire an outside consultant to formulate the proposed student assignment plan. There are no statements apparent in Board Minutes admitted into evidence that indicate Ruiz ever vocalized his subjective belief as to the priority

---

**15.** Shortly thereafter when the Court denied preliminary injunctive relief to Plaintiffs, Mr. Ruiz apparently stated publicly that the judicial ruling was "somewhat of a travesty" and was "predetermined." *See Austin American–Statesman,* August 21, 1987, pp. 1 and 12. Judge Smith set a hearing for August 21, 1987 on the question of his recusal from the case and withdrawal of his order denying injunctive relief after learning of Ruiz' accusations. Mr. Ruiz failed to attend the hearing on his earlier accusations at which attorneys for all parties declared that they did not view the court as having acted improperly and could see no reason for removal from the case. Explaining his absence

at the hearing called to develop his allegations of unfairness, Ruiz was quoted: "I don't think simply because a judge says he's calling a hearing for some reason or another makes it so. I think there may have been another agenda." *Austin American–Statesman,* Wednesday, August 26, 1987, pp. B1 and B7.

**16.** Criteria # 1 targets ethnicity in each school to be a range within 10 percentage points of the white population in the district. Criteria # 6 states that students not be bused for integration purposes prior to the sixth grade level.

that should be given each criteria, or that adoption of the criteria by the Board should be conditioned upon the hiring of an independent consultant. In fact, the June 23, 1986 Board Minutes reflect that his motion to adopt the criteria states "[i]f a consultant is hired ..." indicating no intention that an outside planner was required. Ruiz also testified that he advocated an east-west busing plan for elementary school children, though he conceded that no mention of this proposal had been made during the preliminary injunction hearing or during discovery in this case.

The Court is not persuaded by the testimony of Mr. Ruiz. A substantial portion of Mr. Ruiz' direct testimony at trial was read from prepared notes. Mr. Ruiz' testimony was often contradictory, stating one time that the June 23, 1986 Board Minutes were erroneous, then later stating that he had reviewed the minutes for error and made the necessary changes. He testified that the 1987 plan was the result of the election of anti-busing members, but later did not identify who, if anyone, came forth with a more segregative plan as a result of the election.

Witness Ruiz testified that racial motivations were evident at Board meetings after 1986 at which frequent 4–3 votes occurred; Trustees Ruiz, Perez and Hart being in the vote minority. He appeared to indicate that these "racially motivated" votes occurred most frequently at times when motions made by himself were defeated by the 4–3 vote margin. Other evidence presented to the Court indicated that many split votes occurred at AISD Board meetings after 1986 in which one or more Anglo board members appeared on the minority or non-prevailing side, including Board President Ed Small. Mr. Small's subsequent testimony in this case did not reveal a view that his occasional losses were racially motivated. On rebuttal, Plaintiff again called Mr. Ruiz at which time he supplemented his original testimony with new versions of the bases and discriminatory intent of Board action. Additionally, Ruiz testified at this time that he is familiar with illegal actions and pressures having observed such actions and pressures in Washington and in his employment with the State of Texas.

The Court finds that Mr. Ruiz' uncorroborated assertions of racial motivation have no support in any direct evidence offered by any party in this case, and are not worthy of serious consideration as matters of reliable evidence. To find otherwise after consideration of the history and content of this witness' testimony would require this Court to find that just because Mr. Ruiz says it is so makes it so. His conclusions on Board intent are speculative, frequently self-serving, inconsistent and unworthy of credibility.

Plaintiffs called as other witnesses parties whose children are or had been AISD elementary school students, as well as a retired AISD elementary school principal. Although the parent or former student witnesses testified as to the salutary effects of an integrated educational experience, effects with which this Court fully agrees and adopts, none of these witnesses testified with either clarity or certitude that school trustees acted with discriminatory intent in approving the April 1987 assignment plan. The Court finds convincing and sincere the testimony of witness Laurie Jones, formerly an elementary school teacher and Principal in the east Austin area, that many predominately minority student elementary schools in Austin are in less than adequate repair and are in immediate need of repair, modernization or reconstruction.

A theme of the testimony offered by Plaintiffs' parent witnesses was the expressed conviction of these parents as well as representatives of the ACLU and NAACP that segregation is harmful to school children, the community, and the Nation. This Court is deeply committed to the ideals manifest in the United States Constitution and federal law that no one, adult or child, should be subjected to a world in which people are treated differently because of their race or ethnicity. Courts make difficult decisions which strenuously seek to uphold our ideals while recognizing their expression in a myriad of forms. At no point during the course of

this proceeding has it been necessary to convince this Court that a segregated school system is harmful. The Court's focus, therefore, is not on the established merits of a desegregated school system, but whether the student assignment plan adopted in 1987 was intended to achieve legitimate concerns and educational objectives or was intended to discriminate on the basis of race or ethnicity.

The Court credits the testimony of Dr. John Ellis[17] in his assertions that the 1987 student assignment plan was adopted to alleviate pressing problems resulting from the old plan and to advance legitimate educational objectives. Dr. Ellis testified that major problems faced under the old assignment plan were population growth in light of AISD facility capacity, increased traffic throughout the district leading to longer bus rides, demographic shifts, the opening of newly constructed schools, and the ramifications of H.B. 72 [18] which necessitated new facilities to house the extra classes required to satisfy the state statute. He indicated that the Board directed him to find new ways to organize the burdened system in alignment with the nine criteria to the greatest extent possible. Dr. Ellis further testified that meeting criteria # 1, targeting the ethnicity in each school to be within 10 percentage points of the white population districtwide, was the paramount goal.

In defense of the Board's decision to forego hiring an independent consultant, Dr. Ellis testified that his staff was fully competent to devise the new student assignment plan. Great pains were taken to isolate those responsible for drafting proposed plans (primarily Dan Roberts and Dan Robertson and their staff) from outside influence during the preliminary formulation of boundary changes and transportation routes. This was done in an attempt to maintain the same objective perspective that would be afforded an outside consultant had one been retained. Review by individual Board members and public discussion did not occur until several plans had been drafted. Dr. Ellis further testified that at no time was a "separate but equal" approach taken by the planners, and that the Priority Schools Program arose after it became apparent that some elementary schools would be predominantly minority.

Dr. Ellis stated that the selection of administrators and staff members for all schools focused on the individual's record and experience, and not their ethnicity. Priority Schools were essentially given first choice at teachers and support staff members from the entire district. Dr. Ellis also testified that most principals who had been in schools before they were labeled "Priority" remained there because they had demonstrated that they had done a good job. The intent of the program, he said, was to benefit minority students, not discriminate against them. In regard to the construction of new facilities for the Priority Schools, Dr. Ellis indicated that, while there was no current policy that minority schools be given preference for construction of new facilities, this matter was pending with the upcoming bond election.

---

17. Dr. Ellis has been employed as Superintendent of AISD since 1980, and was largely responsible for the implementation of the desegregation of the school district called for in the 1980 Consent Decree. Dr. Ellis received a Master's Degree in educational administration from Case Western University, and a Doctorate degree from Harvard University in educational administration as well. He earned additional graduate course credit in educational administration from the University of Texas and Columbia University. Prior to entering Harvard University, Dr. Ellis worked as a public school teacher and as an elementary school principal in Ohio. After completing his Doctorate at Harvard, he served in the position of Superintendent of schools in Massillion, Ohio; Lakewood, Ohio; and Columbus, Ohio. Thereafter, from 1977–80, he served with the U.S. Office of Education as Executive Deputy Commissioner of Education. From that position he came to Austin, Texas, as superintendent for AISD. Dr. Ellis is the author of numerous professional articles related to school board relationships, innovation in education, general education, and desegregation.

18. H.B. 72, enacted by the Texas Legislature in 1984, mandated a 22:1 teacher/pupil ratio, as well as required establishment of pre-kindergarten programs.

On the subject of discrimination as a whole, Dr. Ellis testified that the status of ethnic relations in AISD is praiseworthy when viewed in the context of the nation's overall racial tension. He stated that no Board member has ever asked him to circumvent the Consent Decree, and that he has never supported any assignment plan for the purpose of discrimination or to produce a discriminatory effect. The Court is impressed with Dr. Ellis' academic and experience background as well as with the genuineness of his testimony.

The Court finds persuasive the testimony of both Dan Robertson, Assistant Director for Management Information of AISD, and Dan Roberts, Director, Transportation Department, regarding the methods and motives involved in the formulation of the student assignment plan. Robertson testified that it became evident in 1984 that compliance with H.B. 72 under the old plan would require an additional 290 classrooms while computer estimates indicated other plans could reduce that number to 120. He also stated it was not until 1986 that new facilities were opened as a result of the first bond election held after the Consent Decree. It was this dilemma which led Robertson to propose the organization of grades 6–8 into a middle school system.

Robertson stated the most difficult aspect of developing both neighborhood elementary schools and organizing a middle school system was drawing their respective boundary lines. Both Robertson and Roberts utilized the computer program "Mapnet," apparently one of the most advanced systems available at the time, in an attempt to draw boundary lines in conformity with objectives outlined in the criteria and on a racially neutral basis. As a result 45 out of 63 elementary school boundaries were changed in an effort to maximize integration. Robertson stated that isolation from the public and Board members during the formulation of the plan afforded objective perspective. The new plan, according to Robertson, succeeded in reducing the number of long bus rides and more equitably allocated the burden of transportation by reducing the number of years minority students spend in transportation while increasing the years Anglo students would be transported, and that classroom overcrowding had been alleviated making better use of existing facilities.[19] Former Trustee Ruiz testified that he had confidence in Mr. Robertson's integrity.

Dan Roberts' role in the formulation of the plan involved the development of transportation routes. Roberts indicated that bus routes under the 1980 plan flowed east and west, although Austin's primary streets and arteries run north and south. When traffic volume became more problematic, east to west transportation grew more congested resulting in increasing complaints about long bus rides and safety hazards. Roberts stated that as a result of the new plan, bus rides over 45 minutes in duration dropped from 64 routes to 11, with only two (2) long bus rides remaining at the elementary school level. Roberts confirmed that the transportation tables used by Dr. Stolee were not limited to regular routes and therefore skewed time and distance averages. Roberts also stated that overall averages are not the significant numbers relied on by the transportation department, but can only be viewed in the context of efficiency and the number of busses deployed by the school district. For example, Roberts claimed, it would be implausible to send a 65 person bus on a route to pick up 6 students in an attempt to decrease the district's overall average ride time. Another factor influencing average ride times occurs due to Texas law which does not provide funding to transport students residing within two (2) miles of their school.

Witnesses for Defendant AISD included Ed Small, a member of AISD Board of Trustees at the time of adoption of the April 13, 1987 assignment plan and currently President of the Board; Dr. John Ellis, Superintendent of AISD; Daniel L. Robertson and Dan Roberts, AISD staff members; Bernice Hart, AISD Board member; Dr. Glynn Ligon, Executive Director of the Department of Management Information at

---

**19.** Transportation of AISD students in grades 6–12 continues for purposes of integration.

AISD; and Elida Vasquez–Bera, Principal of Govalle Elementary School, one of the schools included in the assignment plan as a Priority School.

Ed Small is an Austin, Texas attorney elected to the AISD Board of Trustees in 1980. He sought election to the Board as the 1980 Consent Decree mandating school desegregation in AISD was being implemented using the campaign slogan "Let's Make It Work." Mr. Small testified extensively about the motives and processes that went into the formulation of the new student assignment plan. Mr. Small has continually held office as an AISD Board member since 1980. He reiterated that the changes in student assignment were made as a result of demographic shifts in AISD, population increases, the opening of new schools, H.B. 72, overcrowding in some schools, and a desire to implement a middle school concept system wide. Small stated that various criteria were formulated by the Board and Superintendent John Ellis before formal adoption of the nine criteria in 1987. He also testified that he voted against adoption of the criteria because he felt that not all elements could be satisfied without some expense to each other, but voted for the 1987 plan because it met the criteria as best it could. He stated that adoption of a neighborhood system for elementary schools was implicit in criteria # 6. Small testified that he negotiated with both Abel Ruiz and Bernice Hart in a attempt to include aspects of the plan they wanted. Small also testified that he would not have supported the plan had Board member Bernice Hart not supported it.

Mr. Small was cross-examined at length concerning the possibility that a neighborhood elementary school system would lead to an increase in racially identifiable schools because of the demographics of east Austin. He stated he realized the night the Board voted to adopt the nine criteria that neighborhood elementary schools would result in an increase in minority schools but he did not anticipate a specific number of schools. Small further stated that when criteria # 1 is considered in light of criteria # 6, ethnic imbalances in elementary schools are implied. Small also

testified that all Board members agreed that neighborhood elementary schools were better from an educational standpoint than a school system with long bus rides involving young children. He noted that he and those on the Board who voted for the April 1987 assignment plan supported the plan as the most workable method of implementing the earlier adopted criteria and for the purpose of meeting the challenges presented by ethnicity changes in schools due to demographic changes, population growth in Austin, new schools provided in an approved 1983 school construction bond issue, school overcrowding, the state mandates of H.B. 72, and the need for conversion from a junior high school to a middle school format. According to Small's testimony, the 1987 assignment plan was adopted by a majority of the Board only after staff presentations, Board member input, discussions with PTAs and community groups, and public meetings and hearings at every high school in the district. Although assignment "trade-offs" and compromises were made among and between the individual interests of all Board members, Mr. Small testified that all trustees supporting the 1987 plan did so because they sincerely believed it to provide the best educational opportunity and quality for every child in the district.

Ms. Hart, a native Austinite, received her early education in east Austin, and began her career as an educator in 1947. She is Black and has been a member of the Board of Trustees since 1982. Ms. Hart testified that she was the Board member who first raised the complaint that the burden of integration through transportation was unfairly placed on young minority students in east Austin. She stated that each year she personally received an increase in the number of complaints brought by minority parents objecting to their young children having to catch a bus at 7:00 a.m. and endure a long bus ride. This witness reaffirmed the validity of other concerns discussed *supra* dealing with transportation safety, overcrowded facilities, and H.B. 72. Ms. Hart favored a neighborhood elementary school program as a means to address these prob-

lems, and also believed neighborhood schools would provide a better learning environment for children of tender years. At no time did she sense that the 1987 plan was adopted with discriminatory intent. Ms. Hart supported and voted for the April, 1987 plan with assurances that the Priority Schools Program would be fully funded and implemented. On cross-examination, and later comment in closing argument, counsel for Plaintiffs sought to show that Ms. Hart did not believe segregation is harmful in order to have her testimony judged in that light. The Court is not persuaded by this argument. Ms. Hart testified that she had attended segregated schools as a child, that at that time she could not change the segregated system, and that she succeeded in spite of segregation not because of it. The Court hears and accepts Ms. Hart's testimony, not as an assertion that segregation is not harmful, but as a statement of pride in her achievements as a Black woman who made the best of the educational system and opportunities offered to her at that time. The Court finds Ms. Hart's testimony to be open, sincere and credible.

Defendant presented evidence through the testimony of Dr. Glynn Ligon that student achievement in the Priority Schools has increased during the first two years of implementation of the Priority Schools Program (Educational Excellence Plan). Dr. Ligon serves as the Executive Director of the Department of Management Information at AISD. This Department maintains responsibility for collecting, analyzing and reporting school district statistical information. Its Office of Research and Evaluation collects and reviews district student testing procedures and results. AISD's ten year achievement report (see Exhibit D36C) indicates an increase in achievement test scores for students during the 1975–85 period. Greatest achievement gains appeared in grades 2–8 for minority students.

AISD administers to students in grades K–5 two (2) achievement tests: a Criterion Reference Test directed to specific awareness and a Norm Reference Test covering a wide range of subject material. In monitoring results from these tests in the first two years of the Priority Schools Program, Dr. Ligon's office found significant increases in achievement scores of students enrolled in the Priority Schools. In addition, although student attendance in the Priority Schools appeared below average for AISD elementary schools during the first year of the program, attendance was above the district average for those minority schools during the programs second year (see Exhibits D64 and D65) and a high level of parental support and involvement is evident in these selected elementary schools. From Dr. Ligon's testimony it appears that the AISD Board of Trustees has fully met its funding obligations for the Priority Schools Program during the first two years of the Plan's operation.

Ms. Elida Vasquez–Bera, Principal at Govalle Elementary School, a Priority School, testified as to her experience with implementation of the Priority Schools Program and its effects on her school. Ms. Vasquez–Bera, a former bilingual education teacher, had educational experience at Govalle Elementary School both before and after implementation of the Priority Schools Program. Paired with Cook Elementary School under the Priority Program, Govalle acting through its Principal, had first choice in selecting or hiring available teachers and staff over schools not included in the priority grouping. This aspect of the Priority Schools Program as well as other benefits available to the school under its terms significantly improved the quality of education, the achievement of students and parental participation and interest according to Ms. Vasquez–Bera.

Testimony of several of Plaintiffs' witnesses unrefuted by Defendant's witnesses indicates a continued lack of attention by the Defendant to the improvement and physical maintenance of elementary school buildings and facilities located in or bordering on the inner city areas of Austin. Whereas such evidence is considered by the Court in its determination of all factors related to the intent of Defendant in adopting and implementing the 1987 student assignment plan, this evidence does not at

this time clearly demonstrate an intent to discriminate against minority students at these grade levels. It is clear that Defendant AISD's lack of adequate financial resources results in some substandard elementary school facilities, primarily in or near concentrations of minority students in Austin.

If Defendant remains dedicated to integrative policies and practices in the administration of the District elementary schools, it is imperative that attention be extended to those physical improvements of facilities in minority and inner city regions as an encouragement to students who reside within the school's neighborhood and as an attraction to students of diverse race and ethnicity to attend school facilities of superior quality. Those students and their families who have remained within the boundaries of integrated school facilities should be recognized by District attention to provide modern equipment for learning as well as buildings in proper and safe repair. In addition to those schools selected by Defendant as beneficiaries of the Priority Schools Program on the basis of minority student populations, other metropolitan area or inner city elementary schools having minority populations of between 54% and 80% are in need of attention if integration is to be preserved.[20]

Four AISD elementary schools each having a student population of 80% or more are apparently not included in the District's Priority Schools Program and therefore do not receive the personnel and financial incentives that the remaining sixteen (16) schools with similar student populations receive. The Court remains curious as to why Andrews (89% minority), Blanton (81% minority), Harris (80% minority), and Ridgetop (83% minority) elementary schools do not receive the benefits of the Priority Schools Program.

These concerns related to facilities and equipment for elementary school students

do not at this time convince the Court that AISD acted with discriminatory intent in the adoption of the April, 1987 student assignment plan. Substandard or inadequate buildings and equipment appear to be primarily the result of fiscal pressures on the school district occurring as a consequence of increasing unfunded requirements imposed by state legislation and by the recent defeat of a proposed school construction and improvement bond issue submitted to district voters and supported by the Board. In March, 1990 another bond issue will be offered to AISD voters. Should this issue receive voter approval some inadequacies in facilities can be alleviated.

Proper funding of educational and integrative actions proposed and implemented by the Board of Trustees of AISD are essential if the District is to remain free of federal judicial intervention. Without the material means available to pursue worthy educational goals the best intentions of school authorities cannot be met. In addition to the upcoming bond issue proposed by the Board to district voters, the Texas Legislature will meet beginning February 27, 1990 in Special Session called by the Governor of the State to address issues of statewide significance related to Texas public school finance. Problems central to the effectiveness of both education and integrative programs of Texas elementary and secondary schools are capable of solution only through the enlightened action of the state legislature. Without such action school boards and district staff cannot achieve long-term, meaningful improvement. A combination of action by school boards in major metropolitan areas of the state and state legislative reforms in public school finance can substantially increase educational opportunity for all citizens of the state. If integration is to continue, school districts in urban areas must be willing to reassess the traditional concept

20. T.A. Brown Elementary (33% Anglo), Dawson Elementary (18% Anglo), Galindo Elementary (30% Anglo), Houston Elementary (26% Anglo), Linder Elementary (23% Anglo), St. Elmo Elementary (37% Anglo), Widen Elementary (26% Anglo), Wooldridge Elementary (35% Anglo, 30% Black, 35% Hispanic), Wooten Elementary (38% Anglo). If these so-called "second-tier" elementary schools are to remain integrated AISD must devote needed resources to them.

of "neighborhood" as old school facilities become obsolete and new facilities are constructed. At the same time the Legislature must deal with those financial and integrative problems resulting from the large numbers of public school districts in Texas. It appears that with state court encouragement efforts are ongoing in this state to accomplish worthwhile goals in public elementary and secondary education.

Protection of those advances in integration already made in AISD requires constant vigilance and review as well as public support. Segregation because of race or ethnicity in public education through either polite inaction or conscious intent cannot be tolerated. Should local authorities with purpose fail in those tasks already begun in AISD, on appropriate presentation this Court will not hesitate to act.

Absent proof of Constitutional infirmity in Board action this Court, pursuant to our nation's time-honored principles of federalism, will not seek to impose its agenda for reform upon duly elected, conscientious local officials who, guided by an informed constituency, should be unfettered in the performance of their official duties. Evidence presented at this trial convinces the Court that neither Constitutional violation nor other offense to the laws of the United States occurred by any intentional action of the Board of Trustees of AISD.

## IV. CONCLUSIONS OF LAW

By virtue of the June 14, 1983 order of this Court to which all parties agreed, the Austin Independent School District became a unitary district and by the terms of that Consent Decree judicial supervision of the District ceased in September, 1986. The parties in this case are bound by the provisions of the June 14, 1983 Consent Decree. Thus, after September, 1986, AISD became a unitary school district in all areas of its operation of Austin's public schools and received judicial recognition that it had eliminated "root and branch" all vestiges of its former dual school system. *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 30–32, 91 S.Ct. 1267, 1282–84, 28 L.Ed.2d 554 (1971);

*Green v. County School Board of New Kent County, Virginia*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *United States v. Texas Education Agency (Overton)*, 834 F.2d 1171 (5th Cir.1987). The unitary status of AISD after 1986 gives it a clean slate with regard to alleged discriminatory practices, therefore, the burden falls upon Plaintiffs to demonstrate that action taken by the school board on April 13, 1987 was taken with the intent to discriminate because of race or ethnicity. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Overton*, 834 F.2d at 1176–1177; *Riddick v. School Board of City of Norfolk*, 784 F.2d 521 (4th Cir.), *cert. denied*, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986). Plaintiffs have failed to bear their burden in this case.

Valid educational concerns formed the basis of the Board's decision to adopt the April 13, 1987 student assignment plan. Although the Board had knowledge that there was a likelihood additional elementary schools in certain geographical areas of the District might experience an increase in concentration of racial or ethnic minority students as one consequence of the new plan, the evidence in this case clearly shows that the primary impetus for the plan's adoption emanated from pressures and needs unrelated to any discriminatory motive. Also, an awareness of consequences does not amount to proof of a discriminatory purpose. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Any adverse affect on racial or ethnic statistical balances in a few elementary schools was, in the view of a majority of the Board, far outweighed by the beneficial short-term and long-term educational advantages that they hoped would result from implementation of the new plan. The Board embarked upon the course set by the new assignment plan in spite of the possible increase in minority concentrations in a few schools and with at least two prescriptions to remedy that mal-

ady: a continuation of the voluntary majority to minority transfer policy, and establishment of the Priority Schools Program. Under such circumstances there can be no finding of intentional discrimination by this Court. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Court recognizes that a voluntary transfer policy alone is not sufficient to salvage an otherwise discriminatory system. *Green v. County School Board of New Kent County, Virginia,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In the present case, however, the Court considers the transfer policy as one factor that supports the finding that the 1987 plan was not formulated with the intent to discriminate.

■ That some racially identifiable schools resulted from the implementation of the new plan is not alone an indication of a school system that intentionally practices segregation. *Swann,* 402 U.S. at 25–26, 91 S.Ct. at 1280–81. The mere fact that racially identifiable schools are the result of a neighborhood concept, however, will not make a segregative system constitutionally palatable. *Valley v. Rapides Parish School Board,* 646 F.2d 925, 938–940 (5th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982). It is also recognized that immutable geographic factors which prevent the homogenation of all student bodies does not preclude the perpetuation of unitary status. *Ross v. Houston Independent School District, et al.,* 699 F.2d 218, 225 (5th Cir.1983). In the present case, the Court recognizes that the location of concentrations of racially or ethnically identifiable residents in particular geographical areas of the Austin metropolitan area together with changes and shifts in these population concentrations are common to most cities and result from economic conditions and cultural interests outside the control of AISD. This is not to say that a school district is free to ignore the demographic reality of its boundaries in formulating student assignments; rather, the district should not be considered a villain to unitariness merely because a legitimately motivated plan fell prey to the geographical limitations of the district. In seeking to provide educational opportunity for students in these areas of identifiable population concentrations the District may not discriminate on the basis of race or ethnicity and AISD did not so discriminate in this case. Plaintiffs specifically failed to prove that the neighborhood school approach for elementary schools adopted in 1987 was intended to discriminate or even disprove that certain educational objectives were the controlling force behind the plan. The increase in number of racially identifiable schools under the 1987 plan, without more, amounts to evidence of disparate impact but not intentional discrimination. A showing of *de facto* "discrimination" is not equivalent to proof of discriminatory intent. *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296; *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 1278.

■ The Court's undeniable responsibility in this case, and in similar cases, is to assure that school authorities exclude no pupil of a racial or ethnic minority from any school, directly or indirectly, on account of race. *Swann,* 402 U.S. at 21, 91 S.Ct. at 1278. AISD under the new student assignment plan sought to enlarge educational opportunity and promote greater minority student academic achievement in the Priority Schools while meeting constituent demand from both minority and majority patrons to provide schools for children of tender years at locations in reasonable proximity to their homes. It is proper for a school district to consider the age of students in evaluating the extent to which they should be subjected to involuntary transportation. *Swann,* 402 U.S. at 31, 91 S.Ct. at 1283, 20 U.S.C. § 1702. Absent proof that in adopting a neighborhood elementary school policy, Board members intentionally sought to discriminate, this Court will not interfere, and may not interfere, in the legitimate policy making responsibility of the local board nor substitute its judgment for the judgment of duly elected local officials. *Swann,* 402 U.S. at 31, 91 S.Ct. at 1283; *Overton,* 834 F.2d at

1177. The new assignment plan maintained the pre-existing majority to minority transfer policy of the District allowing any student of a racial or ethnic majority in any elementary school to transfer, with free transportation, to an elementary school at which the transferring student's race or ethnicity is in the minority. No Black or Hispanic student in any of the sixteen (16) Priority Schools is required or compelled to remain at that school nor is any other student in any school in which his or her race is a majority required to remain in that school if the desire is to transfer to a school in which that student's race is in the minority. Majority to minority transfer policies similar to the AISD policy are worthy integrative tools and their use, implementation, and availability indicate dedication to an integrated school system despite geographical obstacles. *Crawford v. Board of Education*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982); *Swann*, 402 U.S. at 26–27, 91 S.Ct. at 1281–82; *Pasadena City Board of Education, et al. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Flax v. Potts*, 864 F.2d 1157, 1162 (5th Cir.1989); *Ross v. Houston Independent School District, et al.*, 699 F.2d 218 (1983); *Riddick v. School Board of City of Norfolk*, 784 F.2d 521 (4th Cir.), *cert. denied*, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986); 20 U.S.C. sec. 1713.

The Plaintiffs provided the Court with over 60 exhibits, identified by Dr. Stolee, which purport to show, among other things, that transportation times were not decreased as a result of the new plan. Exhibits P21–P82 were compiled by Dr. Stolee using a methodology he developed that was neither defined nor explained to the Court. The Court finds that statistics dealing with transportation listed in these exhibits are at times unreliable or irrelevant and do not establish that previous inequities in busing or lengthy rides continue to exist under the 1987 plan. Plaintiff's Exhibit 22 shows that busing of minority students declined 7% under the current Plan while the percentage of Anglo stu-

dents bused remained the same. While the numbers may not be impressive, the Court finds the decrease in minority busing consonant with one objective of the new Plan, to more equitably allocate the burden of transportation among minorities and Anglos. The Court has not been made aware of the relevance of over 20 charts and tables [21] dealing with the percentages of Black and Hispanic students transported in a bus of either more than 90% or less than 10% of minority students of the same race. It is the ethnic composition of the individual schools, and not the ethnic balances present in each individual school bus, that concerns this Court. Assuming there is some legal significance to this evidence, the Court notes that transportation of students in predominantly minority buses declined 3.5% under the 1987 Plan.

The Court is particularly concerned with the reliability of the table which purports to show the difference in overall average bus rides under the present plan.[22] The table indicates that the overall average ride under the 1987 plan is only 1.43 minutes shorter than under the previous system. Upon review of the data used to arrive at this figure,[23] the Court finds that the table does not accurately portray the impact the 1987 assignment plan has had on student transportation. As discussed, *supra*, the data includes all bus routes except those provided for special education which affects the weight given by the Court to percentages drawn from this data. For example, Transportation Director Dan Roberts testified that under the old plan 64 regular bus routes exceeded 45 minutes in duration, with the number reduced to 11 under the current Plan. The Court reiterates its finding that the figures asserted by Mr. Roberts during testimony are accurate. According to the data relied on by Dr. Stolee, however, there were 85 bus routes which exceeded 45 minutes in duration under the old plan, with 32 such routes remaining under the new Plan. Clearly the

**21.** Plaintiff's Exhibits 23–50.

**22.** Plaintiff's Exhibit 62

**23.** Plaintiff's Exhibits 63–64.

Court cannot rely on Plaintiff's numbers where such discrepancy is evident.

■ Plaintiffs have likewise failed to satisfy the Court that AISD through the April 13, 1987 student assignment plan, the Priority Schools Program, or otherwise has intentionally discriminated in the provision of faculty or staff at any of the elementary schools affected by the plan. Having been judicially declared free of such practice by the June, 1983 Consent Decree no credible evidence has appeared in this case to indicate that AISD has done other than seek out and retain the most qualified individuals available for faculty and staff positions within the District without regard to race or ethnicity. *Green v. County School Board of New Kent County, Virginia,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Riddick v. School Board of City of Norfolk,* 784 F.2d 521 (4th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986). This Court does not dispute the figures offered by the Plaintiffs that indicate a significant number of minority administrators and staff employed at certain predominantly minority schools.[24] There remains no convincing evidence that the decision by AISD administrators to staff minority schools with Black and Hispanic educators in percentages above the district average was done to purposefully discriminate or create an atmosphere of racial self-consciousness among minority students. The allocation of administrators and staff in accordance with pre-established racial quotas and ratios is not a necessary requisite to the maintenance of desegregation in a school system. *Swann,* 402 U.S. at 24–25, 91 S.Ct. at 1280–81. Whether the present Board's policy is preferable to a plan that emphasizes the ethnic distribution of a school's staff exclusive of the qualifications of its members is a matter for public debate but is not evidence of intentional discrimination in this case.

■ The role of federal courts is to ensure that purposeful separation of the races in public education does not occur. The threshold of such federal judicial superintendence over a unitary school system is a finding of discriminatory intent. If no constitutional infirmity has been found the court's inquiry is completed. *Arlington Heights,* 429 U.S. at 270–71, 97 S.Ct. at 566–67. It is not the role of this Court to second-guess the judgment of a school district exercised in the course of its self-governance in the absence of such infirmity. *Overton,* 834 F.2d at 1177. Without deference to the actions of the school board the declaration of unitariness entered by this Court in 1983 would have no meaning. The prize of unitariness must not be readily taken from the grasp of school districts, for without it there would be little incentive to fulfill integrative obligations without continued federal surveillance. By no means does unitary status afford the AISD carte blanche in the development of subsequent student assignment plans despite their potential for segregative effect. It is an acknowledgement by the Court that AISD made major strides in assuaging the damage caused by a dual school system borne of historical inequities between the races. A declaration of unitariness by this Court rewards such efforts by reinstating public trust to the custody of the school district. In the absence of constitutional violation AISD is held accountable to members of the public rather than the judgment of this Court. Risks involved in the years following the termination of judicial supervision are evident, a primary concern being that the school district that once perpetuated a dual system will revert to ways of the past. Risks must be taken, and local government given its chance, for in the end the energy which continues to spawn racial unrest in this country must be neutralized by its citizens and not through the endless scrutiny of the federal judiciary.

Based upon the foregoing findings and conclusions it is the judgment of this Court that Plaintiffs herein have failed to establish that in adopting the April 13, 1987 student assignment plan and Priority Schools Program the AISD, the AISD Board of Trustees, or Dr. John Ellis acted with the intent to discriminate against ra-

---

**24.** Plaintiff's Exhibits 66–74.

cial and/or ethnic minority persons in violation of the Fourteenth Amendment to the United States Constitution. Further, the Court finds that the Defendants have not violated the provisions of Title VI of the Civil Rights Act nor the Equal Educational Opportunities Act of 1974 in adopting and implementing the April 13, 1987 student assignment plan and the Priority Schools Program.