UNITED STATES of America,
Plaintiff-Appellant,

Dedra Estell Overton et al.,
Intervenors-Appellants,

v.

TEXAS EDUCATION AGENCY et al.
(Austin Independent School District),
Defendants-Appellees.

No. 73–3301.

United States Court of Appeals,
Fifth Circuit.

Sept. 7, 1978.

Mario Obledo, MALDEF, Sanford Rosen, San Francisco, Cal., Jim Heidelberg, San Antonio, Tex., Gabriel Gutierrez, Jr., Samuel T. Biscoe, Austin, Tex., Jack Greenberg, Melvyn R. Leventhal, Kellis E. Parker, Sylvia Drew, Bill Lann Lee, New York City, for Dedra Estell Overton, et al.

William S. Sessions, U. S. Atty., San Antonio, Tex., Linda Hanten, Peter D. Roos, Attys., San Francisco, Cal., for Mexican-American intervenors.

John L. Hill, Atty. Gen., Austin, Tex., Brian K. Landsberg, Joseph D. Rich, Attys., Dept. of Justice, Washington, D. C., for the United States.

Donald S. Thomas, Austin, Tex., William H. Bingham, Austin, Tex., for Austin Independent School Dist.

ON PETITION FOR REHEARING AND
PETITION FOR REHEARING
EN BANC

(Opinion November 21, 1977, 5 Cir.
1977, 564 F.2d 162).

Before WISDOM, COLEMAN, and TJOFLAT, Circuit Judges.

WISDOM, Circuit Judge:

Seven years ago, seventeen years after *Brown*,[1] the Attorney General of the United States initiated this tri-ethnic school desegregation suit under the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6. Nothing was being done in Austin to desegregate the schools. The district court held that the Austin Independent School District (AISD) had not discriminated against blacks or Mexican-Americans. This Court heard the appeal from that decision en banc, along with *Cisneros v. Corpus Christi Independent School District*, 5 Cir., 1972, 467 F.2d 142, *cert. denied*, 1973, 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041. In each case the Court (fourteen active judges) unanimously agreed that the school board had intentionally discriminated against both blacks and Mexican-Americans. *United States v. Texas Education Agency*, 5 Cir. 1972, 467 F.2d 848, 864–69 (*Austin I*). In the *Austin* case the members of the Court disagreed (8–6) only as to the remedy. *See* 467 F.2d at 883 and 886.

1. *Brown v. Board of Education*, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; *Brown v. Board of Education*, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

On remand, the district court concluded, after all, that the AISD had discriminated against blacks. But, in agreeing with the Board, it resorted to a remedy not used since the earliest days of school desegregation: the court desegregated one grade. That was the sixth grade. The order to desegregate applied only to black schools, leaving segregation untouched in the district's other grades.[2] The district court left Mexican-American school children in their segregated facilities. The AISD did not appeal. The plaintiffs and intervenors appealed. We again reversed the district court. We held that the plan for desegregating blacks was constitutionally inadequate. The panel unanimously held that the AISD had subjected Mexican-Americans to intentional discrimination. *United States v. Texas Education Agency*, 5 Cir. 1976, 532 F.2d 380, 386–92 (*Austin II*).

On petition of the AISD, the United States Supreme Court granted certiorari, vacated our decision in *Austin II*, and remanded the case to this Court for reconsideration in light of *Washington v. Davis*, 1976, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597.

This Court faithfully reconsidered the case in light of *Washington v. Davis*. We "concluded for the third time, that the AISD intentionally discriminated against Mexican-Americans; that the district court applied an erroneous legal standard in assuming that there could not be discriminatory intent when the actions were prompted by what was thought at the time to have been a benign motive; that the district court's finding as to intent was erroneous." 564 F.2d 162, 174 (*Austin III*). We remanded the case to the district court for a hearing, as required, in our view, by *Dayton*

*Board of Education v. Brinkman*, 1977, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851.

The AISD filed a petition for a rehearing of *Austin III*. The Court asked for responsive briefs from the United States, through the Department of Justice, from the black intervenors, and from the Mexican-American intervenors. The brief of the United States supports the Court's position that the "panel opinion in this case fully comports with the mandate of the Supreme Court" in *Austin II* and is "entirely consistent" with *Washington v. Davis; Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 1977, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, and *Dayton Board of Education v. Brinkman*.[3]

Nothing in the AISD's fourth attack on this Court's holding justifies a rehearing. In reviewing the record, the briefs, and the three earlier opinions, a few points stand out and should be referred to, at the risk of being repetitious, if only for emphasis.

### I.

■ This Court sitting en banc in *Austin I* and in panels in *Austin II* (Judges Wisdom, Coleman, and Simpson) and *Austin III* (Judges Wisdom, Coleman, and Tjoflat) unanimously found that the record showed the AISD had intentionally discriminated against Mexican-Americans.[4] We did so without resort to the *Keyes* presumptions. *Keyes v. School District No. 1, Denver, Colorado*, 1973, 413 U.S. 189, 203, 93 S.Ct. 2686, 37 L.Ed.2d 548. The second *Keyes* presumption is that " 'even if it is determined that different areas of the school district should be viewed independently of each other', 'a finding of intentionally segregative school board actions in a meaningful por-

---

2. The district court agreed with the AISD's rationalization for desegregating only the sixth grade in black schools: desegregation of the elementary schools would require "massive crosstown busing"; the junior and senior high schools were already desegregated; the AISD has no duty to desegregate Mexican-Americans.

3. Brief of the United States in opposition to the petition of the AISD for rehearing, p. 2.

4. The AISD at first argued that there were only two classes—white and Negro—within the contemplation of the Fourteenth Amendment, and that placing Mexican-Americans in black schools desegregated such schools. The district court properly recognized Mexican-Americans as a separate ethnic minority.

tion of a school system . . . creates a presumption that other segregated schooling within the system is not adventitious'." 413 U.S. at 208, 93 S.Ct. at 2697. In a tri-ethnic setting, *Keyes* means that a finding of intentional segregation against one minority group raises the presumption that any segregation suffered by the second minority group was intentional. Here, there is no doubt the AISD discriminated against blacks. This fact alone, therefore, created a presumption—here, we consider, unrebutted—that the segregated schooling of Mexican-Americans was not "adventitious".

 The major thrust of the AISD's petition for rehearing is that the holding in *Austin III* that school officials are responsible for the reasonably foreseeable consequences of their acts reinstitutes the type of effect test condemned in *Washington v. Davis* and *Arlington Heights.* Neither of those decisions abrogated the principle that an actor is held to intend the reasonably foreseeable results of his actions.[5] Given the fundamental nature of that principle, it would be out of character for the Supreme Court to have disapproved its use in discrimination cases—without explicitly saying so. In 1961, when *Monroe v. Pape* was decided, the Supreme Court admonished that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). The Supreme Court has not retreated from this view.

Realistically, this judicial mechanism is the most reliable one for the objective determination of intent. That is doubly true

when intent to segregate is at issue. As recently observed by the Sixth Circuit,

> Indeed, it would be difficult, and nigh impossible, for a district court to find a school board guilty of practicing de jure segregation, unless the court is free to draw an inference of segregative intent or purpose from a pattern of official action or inaction which has the natural, probable and foreseeable result of increasing or perpetuating school desegregation.

*NAACP v. Lansing Board of Education,* 6 Cir. 1977, 559 F.2d 1042, 1047–48. In *Lansing* the court expressly relied upon the natural and foreseeable standard. On petition for certiorari one issue was, "Did the Court of Appeals err in affirming the District Court's use of the natural and foreseeable consequences 'test' . . . ". 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977).

The AISD does not suggest what type of evidence would suffice to make out a case of intentional discrimination. On historical grounds the AISD seems to say that no discriminatory intent is made out unless segregation is ordered by a statute or ordinance. Perhaps, however, the Board thinks that there must be statements by its members that "We do not want to mix whites and Mexican-Americans". Even if individual school board members made public statements favoring segregation of Mexican-Americans, this evidence of subjective intent would not necessarily be probative of the school board's intent; any public body may contain one or two extremists who do not express the sentiment of the body. This is one of the points Justice Stevens made in his concurrence in *Washington v. Davis.*[6] The AISD seems to think that be-

---

**5.** The Supreme Court's remand in this case did not foreclose the utilization of that evidentiary principle in proper circumstances. Where, as here, a school district has engaged in a pattern of decisions in diverse areas, each of which has had the natural and foreseeable consequence of producing "more racial and ethnic separation in the schools than in the residential patterns of the district as a whole," *Austin III,* 564 F.2d at 170, the presumption that the school district intended to discriminate is appropriate. See *National Association for the Advancement of Colored People v. Lansing Board of Education,*

6th Cir. 1977, 559 F.2d 1042, *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491; *United States v. School District of Omaha,* 8 Cir. 1977 (en banc), 565 F.2d 127, *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 765.

**6.** Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of

cause of its stated benign motives, it could not have intentionally discriminated against Mexican-Americans. This notion shows a misunderstanding of school desegregation.

■ The most effective way to determine whether a body intended to discriminate is to look at what it has done.[7] This does not mean that every time a school board decision has a discriminatory effect one should infer that the board intended the result. Rather, as in *Austin III*, the school board's actions must be evaluated in the context of the totality of the board's treatment of minorities. The Board's unreceptivity to integration is clear from the factual findings spelled out in *Austin I and II* and recapitulated in *Austin III*. See especially 564 F.2d at 170–174. In the context of the AISD's performance in the area of race relations, these findings demonstrate an intent to discriminate against Mexican-Americans.

The application of the natural and foreseeable consequences test in *Austin III* was consistent with these principles. We expressly stated that the use of the neighborhood assignment policy, though it foresee-

ably led to segregated schools, was insufficient, standing alone, to sustain a holding of segregative intent. Instead, we regarded this board policy as one item of evidence suggesting segregative intent. The Court evaluated the use of this policy in light of "an extensive series of actions dating back to the early 20th century" and others that had occurred in more recent years. Only then did the Court hold the segregation to be *de jure*. This is in accord with *Arlington Heights* which draws a distinction between "impact alone" and impact plus "other evidence" bearing on the decision-maker's intent. "The impact of the official action . . . may provide an important starting point" for analysis. 429 U.S. at 266, 97 S.Ct. at 564.

■ The opinion in *Austin III* attempted to suggest a functional basis for determining segregative intent by circumstantial evidence. But irrespective of the methodology used in determining segregative intent, the facts clearly show that the AISD segregated Mexican-Americans, except to the extent that some were integrated in black schools.[8]

---

his deeds. 426 U.S. at 253, 96 S.Ct. at 2054 (Stevens, J., concurring).

7. Professor Paul Brest offers two policy reasons why a rebuttable presumption triggered by the natural and foreseeable test is especially applicable in the school desegregation context:
This shifting of the burden of proof is justified on two grounds. First, the school district enjoys far better access than the plaintiffs to the true reasons underlying the myriad of decisions that determine the extent of school desegregation—decisions concerning such matters as the drawing of attendance zone lines, the location and size of new schools, and the closing of old ones. Second, despite indications of support for some degree of school integration, it is reasonable to assume that school boards throughout the nation tend to reflect the desires of many white constituents to avoid having their children attend schools with too high a proportion of minority students.
Brest, the Supreme Court, 1975 Term—Foreword: In Defense of the Anti-Discrimination Principle, 90 Harv.L.Rev. 1, 29–30 (1976). *See also* the thorough discussion of racially discriminatory purpose in Comment, Proof of Racially Discriminatory Purpose Under the Equal Protection Clause: Washington v. Davis, Ar-

lington Heights, Mt. Healthy, and Williamsburgh, 12 Harv.Civ.Rts.—Civ.Lib.L.Rev. 725 (1977).

8. Not all of the evidence of intentional segregation in this case is circumstantial. For example, the Comal Street School was built to "take care of the large number of non-English speaking students at Palm, Metz and Bickler". Pretrial order, Attachment A, p. k–i. Zavala school was built "to provide for the large group of Spanish-speaking citizens of Austin, a suitable, well-equipped building as near the center of this population as possible". Def. Ex. 125, p. 5; Gov. Ex. 6–C, August 8, 1935. In response to a complaint from Anglo parents at the Winn School the Superintendent took the following action: " . . . all Mexican pupils enrolled in John B. Winn School living south of 14th St., had been transferred to Bickler School, except one boy who is being allowed to complete the 7th grade". Gov. Ex. 6–F, September 25, 1935.

The School District had maintained dual overlapping zones. These zones were only found between predominantly Anglo and predominantly Mexican-American schools. 564 F.2d 162, 171–72. The dual overlapping zone is essentially identical to the optional zone frequently found by Courts to be a segregative

## II.

■ There is no merit to the AISD's contentions with respect to this Court's application of the clearly erroneous rule. Rule 52, Fed.R.Civ.Pro. In *Austin III* we held that the clearly erroneous rule did not apply, because the district court applied an erroneous legal standard. The intentional isolation of Mexican-American children is not excusable on the ground that such treatment was inspired by benevolent motives. *Stark v. Shell Oil Co.*, 5 Cir. 1971, 450 F.2d 994, 997. But, we held, alternatively, if Rule 52 applies, the court was clearly erroneous.

## III.

■ The AISD complains that this Court, while purporting to rely on *Dayton*, has attempted "to force a system-wide remedy without regard to the facts that may be found". In *Austin III* this Court repeated the remedial principles expressed in *Keyes, Swann,* and *Dayton*. The *Dayton* case was remanded to the district court, not because the plaintiff failed to show that the violations had system-wide effects, but because neither the district court nor the court of appeals had examined the evidence to determine if the defendant had met its burden and because the lower courts failed to address the available evidence as to the

scope of the liability. In some cases, after years of fruitless litigation, for the guidance of all the district courts throughout the Circuit, this Court has established general guidelines.[9] As a rule, however, we defer to the district court for it to consider and grant the appropriate relief in the particular case before it to remedy the effects of discriminatory conduct. We followed that principle in *Austin III*. Our opinion properly does not dictate the precise relief in this case. School systems in Austin, Corpus Christi, and other cities with tri-ethnic problems are not fungible with school systems generally. As *Dayton* prescribes:

> the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the * * school population as presently constituted, when that distribution is compared to what it would have been in the absence of constitutional violations.

*Dayton,* 433 U.S. at 420, 97 S.Ct. at 2775. See *Austin III,* 564 F.2d at 175. To the extent that we attempted to provide limited guidance to the district court, we were warranted in doing so in the interest of judicial economy. See *Austin III,* 564 F.2d at 164, n. 1.

---

device. See, e. g., *Morgan v. Kerrigan,* 1 Cir. 1974, 509 F.2d 580, 589, *cert. denied* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449; *United States v. Board of School Commissioners of Indianapolis,* 7 Cir. 1973, 474 F.2d 81, 86, *cert. denied* 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041; *United States v. School District of Omaha,* 8 Cir. 1975, 521 F.2d 530, 540–43, *cert. denied* 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280. The AISD does not take issue in their petition for rehearing with this finding.

School construction and abandonment are key indicia of segregative intent. *Swann v. Charlotte-Mecklenberg Board of Education,* 1971, 402 U.S. 1, 21, 91 S.Ct. 1267, 28 L.Ed.2d 554; *Keyes v. School District No. 1, Denver,* 1973, 413 U.S. 189, 201–02, 93 S.Ct. 2686, 37 L.Ed.2d 548. In the *Austin* cases we found that (a) boundary lines were gerrymandered upon the opening of O'Henry Junior High School, (b) Allan Junior High School was rebuilt (after a fire) in its previously segregated locale, (c) Johnston High School was placed to insure its opening as a highly segregated school notwith-

standing options which would have enhanced integration, (d) boundaries were gerrymandered between University Junior High School and Martin, and (e) overcrowding and use of portables in East Austin were commonplace while new schools were built to relieve overcrowding in Anglo areas, 564 F.2d 172–73.

In *Austin III* (as in *Austin I and II*) the Court found an extraordinarily high degree of faculty segregation. This alone has been held to establish a prima facie case of intentional segregation. As the Supreme Court observed in *Swann,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (emphasis added), "Independent of student assignment where it is possible to identify a 'white school' or a 'Negro school' . . . a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown".

9. *See United States v. Jefferson County Bd. of Educ.,* 5 Cir. 1966, 372 F.2d 836; *Singleton v. Jackson Municipal Separate School District,* 5 Cir. 1969, 419 F.2d 1211 (en banc).

The AISD bewails its burden of going forward to meet the prima facie case made (or the presumption raised) by the plaintiffs. *Keyes* and *Swann* establish that once a school district has been found to have engaged in intentionally discriminatory conduct, the burden of going forward is on the school district to meet the plaintiffs' prima facie case. *Austin III,* like the *Swann* and *Keyes* cases, applies the settled principle that the perpetrator of a constitutional wrong bears the burden of demonstrating that its violation had no effect, or a limited effect, on what actually happened. See *Arlington Heights,* 429 U.S. at 271, n. 21, 97 S.Ct. 555; *Mt. Healthy City School District Board of Education v. Doyle,* 1977, 429 U.S. 274, 285–287, 97 S.Ct. 568, 50 L.Ed.2d 471. Cf. *Franks v. Bowman Transportation Co.,* 1976, 424 U.S. 747, 771–773, 96 S.Ct. 1251, 47 L.Ed.2d 444; *International Brotherhood of Teamsters v. United States,* 1977, 431 U.S. 324, 358, 362, 359–360 n. 45, 97 S.Ct. 1843, 52 L.Ed.2d 396.

The allocation of the burden is supported by this Court's recent decision in *United States v. Columbus Municipal Separate School District,* 1977, 558 F.2d 228, *cert. denied,* 434 U.S. 1013, 98 S.Ct. 728, 54 L.Ed.2d 757. There the Court held that a desegregation plan was proper in light of the fact that "we have no reason to suppose that the schools of Columbus would have been less desegregated than they will be under the pairing plan." *Id.,* 558 F.2d at 231 n. 11. In so holding, the Court placed the burden upon the school district, for the effect of the Court's order was to approve a desegregation plan, because the school district failed to carry its burden of providing a "reason to suppose that the schools of Columbus would have been less desegregated * * *."

\* \* \* \* \* \*

Over a long period of years, the AISD tried to separate the Anglo strand from the black and Mexican-American strands of its tri-ethnic school system. But the United States Constitution has tied these strands into a knot no Alexander can cut, and may be used to the greater advantage of the school children of the City of Austin.

The AISD must desegregate blacks in other grades than the sixth grade. The AISD must desegregate Mexican-American school children by putting them in schools with Anglos—as well as with blacks.

The petition for rehearing is denied. No member of this Panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local 5th Circuit Rule 12), the petition for rehearing en banc is DENIED.